El Juez Asociado Señor Kolthoff Caraballo
emitió la opinión del Tribunal.
Este caso nos brinda la oportunidad de interpretar, por primera vez, la figura del “felony murder rule” (asesinato estatutario) conforme a su redacción en el Art. 106 del Código Penal de Puerto Rico de 2004.(1) Particularmente, debemos analizar cuáles son los elementos necesarios para que se configure esta modalidad de asesinato.
Aunque el Código Penal de 2004 fue derogado por la Ley Núm. 146-2012, el análisis que realizamos hoy aplica a casos similares cuyos hechos hayan sido cometidos durante su vigencia. Analizada la controversia, se modifica la de-terminación del foro apelativo intermedio. Veamos por qué.
HH
Los hechos que originan la controversia de epígrafe se remontan al sábado, 26 de junio de 2010, cuando en horas de la mañana, el Sr. Roberto “Cuqui” Rodríguez Mojica rea-lizaba trabajos de mecánica en una guagua Ford 350 esta-cionada en su residencia. Al igual que el señor Rodríguez Mojica, su sobrino, el Sr. Danny Rodríguez Márquez, hacía trabajos de mecánica en una residencia ubicada frente a la de su tío. Mientras trabajaba en su auto, el señor Rodrí-guez Márquez observó en varias ocasiones al menor ESMR transitar en una motora por la calle. Minutos después, el señor Rodríguez Mojica encontró en los predios de su resi-dencia al menor ESMR mientras este intentaba apropiarse ilegalmente de su propiedad. Acto seguido, el señor Rodrí-guez Mojica le propinó un golpe en la parte posterior de la *790 cabeza, que provocó un forcejeo entre ambos. Finalmente, el altercado culminó cuando el menor ESMR huyó del lu-gar y se lanzó por un pastizal aledaño.
Luego, el señor Rodríguez Mojica llamó a su sobrino para que fuera a su residencia. Así lo hizo el señor Rodríguez Márquez, quien al llegar encontró la motora del menor ESMR tirada en el suelo y a su tío recostado de la guagua Ford 350 “sumamente alterado”.(2) A preguntas del sobrino, que no sabía de lo sucedido, el señor Rodríguez Mojica ex-presó, “el cabroncito de [ESMR] se me metió a robar y le di un cantazo con algo por la cabeza, no s[é] con que fue y se me tiró por el monte por ahí pa abajo” [...] vete y búscalo”.(3) En atención a la orden de su tío, el señor Rodríguez Már-quez se dirigió al pastizal por donde huyó el menor ESMR para tratar de encontrarlo. Transcurridos aproximada-mente 25 minutos, el señor Rodríguez Márquez regresó a la residencia de su tío y encontró a este último tirado en el piso “boca abajo, con un golpe en la cabeza y morado”.(4)
Rápidamente, el señor Rodríguez Márquez buscó ayuda de otros familiares, quienes intentaron revivir al señor Ro-dríguez Mojica. Al ver que no respondía, lo llevaron al hospital, donde esa misma tarde se certificó su muerte. Poste-riormente, el Instituto de Ciencias Forenses realizó la autopsia del cuerpo. Del análisis realizado, se determinó que la causa de la muerte fue homicidio por ataque al co-razón (“homicide by heart attack”).(5) En los hallazgos de la autopsia, la patóloga forense detalló que al momento de la muerte, el corazón del señor Rodríguez Mojica tenía un tamaño más grande de lo normal. Además, el señor Rodrí-guez Mojica padecía serias complicaciones de salud, prin-cipalmente del sistema cardiaco. Según los expertos, todos *791 esos padecimientos, sumados a un fuerte estresor emocio-nal, provocaron la muerte del señor Rodríguez Mojica.
Por estos hechos, el 27 de junio de 2010 se sometió una queja contra el menor ESMR. En ella se le imputó la falta de escalamiento agravado.(6) Luego de celebrada la vista, la Sala de Menores del Tribunal de Primera Instancia de-terminó causa probable para la aprehensión del menor. El 1 de julio de 2010 se celebró la vista de causa para la pre-sentación de la querella. Una vez finalizada, se determinó causa probable contra el menor ESMR por la falta de esca-lamiento agravado. Por los mismos hechos, el 15 de julio de 2010 se sometió una queja adicional contra el menor ESMR, en la cual se le imputó la falta de asesinato estatutario.(7) El 16 de agosto de 2010 se celebró la vista de causa para la presentación de la querella y allí se determinó causa probable por la falta de asesinato estatutario.
Posteriormente, el 15 de noviembre de 2010, el 3 y el 17 de diciembre del mismo año se celebraron vistas adjudica-tivas en las que se dilucidaron las faltas imputadas. Tras su culminación, se determinó que el menor ESMR incurrió en las faltas imputadas, por lo que se le impuso una me-dida dispositiva de 18 meses por la de escalamiento agra-vado y 36 meses por la de asesinato estatutario, a cum-plirse concurrentemente.
Inconforme con la determinación de la Sala de Menores del Tribunal de Primera Instancia, el 14 de enero de 2011 el menor ESMR apeló al Tribunal de Apelaciones. Mediante Sentencia de 11 de enero de 2012, el foro apelativo intermedio confirmó, en todos sus extremos, al Tribunal de Primera Instancia. En lo relativo al asesinato estatutario, expresó que al amparo de esta figura “[p]oco importa si la aludida muerte fue ocasionada intencional o incidentalmente”.(8) El 15 de enero de 2012 el menor ESMR presentó una solicitud *792 de reconsideración, que fue declarada “no ha lugar” el 30 de enero de 2012.
Aún inconforme, el 14 de febrero de 2012 el menor ESMR presentó ante nosotros una petición de certiorari, en la cual, entre otros errores, imputó al Tribunal de Apela-ciones haber errado al negarse a reconsiderar su sentencia, para resolver si la prueba presentada establece el elemento de intención requerido por el Art. 106(b) del Código Penal de 2004 (33 LPRA sec. 4734(b)).
El 25 de mayo de 2012 expedimos el auto. Con el bene-ficio de las comparecencias de las partes, estamos en posi-ción de resolver.
II
El delito de asesinato estatutario surge del common law” como consecuencia de una fuerte política pública para disuadir y penalizar con mayor severidad a las personas que durante la comisión de los llamados “delitos base” pro-ducen la muerte a un ser humano. De esta forma, el legis-lador identificó aquellos delitos que entendió debían conlle-var una pena más rigurosa de ocurrir la muerte de una persona en sü consumación o tentativa por estar rodeados de una alta peligrosidad. Originalmente, la incorporación de la doctrina de asesinato estatutario obedeció al pro-blema que confrontaba el Estado para probar el elemento de premeditación requerido en el delito de asesinato en primer grado. Así, al codificar el asesinato estatutario, el Estado solamente estaba obligado a demostrar que se co-metió o intentó cometer el delito base y que como conse-cuencia de ello, se produjo una muerte.(9)
Desde su incorporación al derecho penal en nuestra ju-risdicción hubo cambios en cuanto a los delitos base que el legislador entendió servían para merecer una pena más *793 extrema por toda muerte que ocurriera en la consumación o tentativa de éstos. Sin embargo, los detractores del ase-sinato estatutario proponían su derogación por entender que éste dislocaba el proceso, debido a que atentaba contra la presunción de inocencia al cambiar el peso de la prueba contra el acusado.(10) Esta discusión tuvo lugar al apro-barse el Código Penal del 2004, el cual incorporó un cambio mayor al delito de asesinato estatutario. Ello, debido a que la redacción propuesta cambió el lenguaje utilizado para codificar el asesinato estatutario, con el resultado de eliminar la doctrina clásica de este tipo de delito.(11) Veamos.
A. Historial legislativo del Art. 106 del Código Penal de Puerto Rico de 2004 (33 LPRA sec. 4734)
El Código Penal de 1974 precisaba el asesinato estatutario en el inciso (a) del Art. 83 al disponer como sigue:
(a) Todo asesinato perpetrado por medio de veneno, acecho o tortura, toda clase de muerte alevosa, deliberada y premedi-tada, o cometida al perpetrarse o intentarse algún incendio agravado, violación, sodomía, robo, escalamiento, secuestro, es-tragos, mutilación o fuga. (Énfasis suplido). 33 LPRA. see. 4002 (ed. 2001).
De lo expuesto, surgía que cuando la muerte era come-tida al perpetrarse o intentarse algún incendio agravado, violación, sodomía, robo, escalamiento, secuestro, estragos, mutilación o fuga, se configuraba la modalidad de asesi-nato en primer grado conocida como asesinato estatutario o felony murder rule. Este sólo requería establecer que la causa próxima de la muerte fue la comisión de uno de estos delitos o su tentativa. Por tal razón, no era necesario traer prueba alguna de que el asesinato fue premeditado, delibe-rado o voluntario, porque se trata de un asesinato en primer grado por imperativo de la ley sin necesidad de probar *794 la deliberación y premeditación.(12) Esto era así porque el elemento de malicia para causar la muerte estaba implí-cito en el acto de la comisión del delito grave.(13)
Por su parte, el Código Penal de 2004 codificó el delito de asesinato estatutario en el Art. 106, supra, de la manera siguiente:
(a) [...]
(b) Todo asesinato que se comete como consecuencia natural de la consumación o tentativa de algún delito de incendio agra-vado, agresión sexual, robo, escalamiento agravado, secuestro, secuestro de un menor, estrago, envenenamiento' de aguas de uso público, agresión grave en su modalidad mutilante, fuga, maltrato intencional o abandono de un menor.
(c) [...]
Toda otra muerte intencional de un ser humano constituye asesinato en segundo grado. (Enfasis suplido).
Con relación a la doctrina clásica de asesinato estatuta-rio vigente en el Código Penal de 1974, desde principios de la década de los noventa, la Prof.a Dora Nevares-Muñiz recomendó redefinir el tipo legal de “asesinato” de la ma-nera siguiente:
Asesinato en primer grado [...]
Asesinato estatutario en primer grado consiste en dar muerte intencional a un ser humano en ocasión de cometer o intentar cometer alguno de los siguientes delitos graves, incendio agra-vado, penetración sexual no consentida, robo, escalamiento agravado, secuestro, estragos, agresión grave o fuga. (Enfasis suplido).(14)
Notemos que la profesora Nevares-Muñiz establece que la muerte tiene que ser intencional aunque, contrario a lo que fue finalmente aprobado, la profesora no incluía la ne-cesidad de un nexo causal entre el delito base y la muerte.
*795 Ahora bien, la inclusión del requisito de un nexo causal entre la muerte y el delito base, en unión a la intención de dar muerte, se hace evidente de los Informes Parte Especial Vol. I y II de Estudios Comparados de Códigos Penales de la Comisión de lo Jurídico del Senado de Puerto Rico.(15) En esos informes, la Academia Puertorriqueña de Jurisprudencia y Legislación explicó el texto del Art. 106(b). En particular, expresó lo siguiente:
En la letra (b) se mantiene la figura del asesinato estatuta-rio, pero se incorpora la exigencia de que el asesinato se co-meta como consecuencia natural de los delitos que se mencionan. Sólo entonces [...] el asesinato aparece como reali-zación de la peligrosidad propia de los delitos enumerados y no como consecuencia al azar. Por otra parte, se exige que se trata de un verdadero “asesinato”, subsumible en la definición del Artículo anterior: no cualquier muerte, sino solo la muerte in-tencional por parte del sujeto. Otra cosa contradiría la defini-ción del Artículo [105] anterior y la definición “asesinato en primer grado” del presente artículo. (Énfasis suplido).(16)
Por otra parte, durante las vistas públicas para la apro-bación del Código Penal de 2004, la Sociedad para la Asis-tencia Legal (SAL) se expresó en cuanto al anterior Art. 83 del Código Penal de 1974. Al hacerlo, explicó lo siguiente:

Por muchos años la modalidad del asesinato estatutario (“felony murder rule”) ha estado sujeta a diversos ataques por con-siderarse, “que es un sobreviviente histórico cuya existencia ca-rece de lógica y de base práctica en el Derecho moderno. El continuo ataque de que es objeto responde al señalamiento de que la misma quebranta el principio rector en el Derecho Penal de ‘mens rea’, esto es, que ninguna persona es responsable pe-nalmente por haber producido cierto resultado delictivo, si al momento de producirlo no existía un estado mental capaz de 
*796
producir dicho resultado, o sea la intención específica de producirlo”.

Entendemos que este puede ser el momento propicio para le-gislar, modificar o en alguna forma cambiar, o modernizar este viejo “vestigio anacrónico” vigente en nuestro Código Penal. Para ello proponemos que en el Artículo 83 se legisle un “tercer grado” de asesinato que recoja la doctrina del asesinato estatu-tario vigente, pero que establezca una pena distinta y menos severa para tal delito. No podemos obviar el hecho de que esta clase de asesinato sólo requiere establecer que la causa próxima de la muerte fue la comisión de uno de los delitos incluidos en el tipo legal o su tentativa. No es necesario que el Ministerio Fiscal presente prueba alguna dirigida a establecer los elementos del delito de asesinato en primer grado; solamente se requiere que el Estado presente prueba sobre el delito base y sobre el hecho de que ocurrió una muerte. Incluir el asesinato estatutario como otro “grado” del delito de asesinato, con penas menos severas, puede ser una alternativa viable para alejarnos de una doctrina que entendemos es injusta e insostenible en el Derecho penal. (Citas omitidas y énfasis suplido).(17)
Igual interpretación hizo la profesora Nevares-Muñiz cuando comentó:
Esta clase de asesinato, denominada en inglés felony murder rule, se interpretó bajo el Código Penal de 1974, como que sólo requiere establecer que la causa próxima de la muerte fue la comisión de uno de los delitos incluidos en el tipo legal o su tentativa. Bajo los Códigos de 1902 y 1974 no era necesario traer prueba alguna de que el asesinato fue premeditado, de-liberado y voluntario. Cuando tal era el caso se trataba de un asesinato en primer grado “por fuerza de ley”. El elemento mental requerido bajo los Códigos de 1902 y 1974 era el del delito base.
Sin embargo, esta interpretación histórica varía en este nuevo Código. Se han introducido dos cambios. Primero, que se trate de un “verdadero asesinato subsumible en la defini-ción del artículo [105] anterior; no cualquier muerte intencio-nal por parte del sujeto”. Esto es, no basta la intención de *797 cometer el delito base, sino que ahora se requiere intención de causar la muerte, ya que “asesinato” [...] se define como “dar muerte a un ser humano con intención de causársela”.
Segundo, ahora el asesinato estatutario requiere que el ase-sinato se cometa como consecuencia natural de uno de los delitos base. No basta que el delito base sea la causa próxima de la muerte, sino que es necesario que la comisión del delito base, o su tentativa constituya un riesgo considerable y típi-camente relevante que se realice en el resultado. La muerte de una persona tiene que ser la consecuencia lógica o natural de la consumación o tentativa del delito base. Como indica el In-forme de la Medida, P. del S. 2302, Comisión de lo Jurídico del Senado: “Solo entonces el asesinato aparece como realización de la peligrosidad propia de los delitos enumerados y no como consecuencia al azar” (p. 44). (Citas omitidas).(18)
Por su parte, el Prof. Luis Ernesto Chiesa Aponte expresó su preocupación con el texto presentado durante el proceso legislativo del Código Penal de 2004, ya que limitaba el de-lito de asesinato estatutario a aquellas situaciones en las que la muerte ocurre como consecuencia natural. A esos fines, el profesor Chiesa expresó lo siguiente:
La primera observación que hay que hacer al delito de ase-sinato es que la redacción propuesta al eliminar la doctrina clásica del asesinato estatutario (“felony murder”), establece en el inciso (b) del artículo 106 que sólo las muertes que ocu-rren como consecuencia natural de alguno de los delitos base subyacentes clasificarán para ser consideradas asesinato en primer grado. Esto tiene poco sentido desde un punto de vista de política criminal; debe bastar para que se considere asesi-nato en primer grado que la muerte se haya producido con dolo eventual (como consecuencia probable del acto y con indi-ferencia a la producción del resultado lesivo).(19)
Finalmente, y contrario a las recomendaciones de la SAL y del profesor Chiesa Aponte, la Asamblea Legislativa aprobó el Código Penal de 2004 con un delito de ase- *798 sinato estatutario, el cual exigía que la muerte haya sido provocada por un asesinato, entiéndase con intención de causarla, y que además sea como consecuencia natural de la consumación o tentativa del delito base.
Sin embargo, el cambio en el lenguaje causó incertidum-bre con relación a si el delito de asesinato estatutario fue erradicado de nuestra normativa. El asunto fue aclarado por este Tribunal en Pueblo v. González Ramos, 165 DPR 675, 709 (2005), donde expresamos que
[...] no hay duda de que el asesinato estatutario se mantiene tipificado en el nuevo Código Penal. En otras palabras, la mo-dalidad de asesinato estatutario no ha sido suprimida por el Código Penal de 2004, meramente hubo un cambio en la ter-minología del delito —Art. 106, ante— de asesinato estatuta-rio, lo cual, de ninguna forma significa que el asesinato esta-tutario no se encuentre codificado en el nuevo Código Penal de 2004. (Énfasis en el original).
Hoy hacemos eco de nuestras pasadas expresiones. No obstante, aclaramos que el delito sufrió un cambio trascen-dental en su redacción, por lo que es nuestra labor inter-pretar dicho estatuto a la luz de su texto y de la intención del legislador cuando enmendó el artículo.
En este sentido, es importante destacar que el estatuto derogado, el Art. 83 del Código Penal de 1974, supra, establecía que el asesinato estatutario aplicaría a “toda muerte”. Sin embargo, el Art. 106 del Código Penal de 2004, supra, sustituyó la palabra “muerte” por “asesinato”. Como podemos observar, la redacción del Art. 106 del Có-digo Penal de 2004, supra, exigía que la muerte fuera pro-ducto de un “asesinato” y, a su vez, que fuera “consecuencia natural” de la consumación o tentativa de algún delito base. A su vez, el legislador definió el término “asesinato” en el Código Penal de 2004 al definirlo en el Art. 105 como “dar muerte a un ser humano con intención de causársela”. (Énfasis suplido). 33 LPRA sec. 4733. Ahora bien, no debemos olvidar que el Código Penal de 2004 considera la “in-tención” como aquella que surge cuando: (1) “el hecho co- *799 rrespondiente ha sido realizado por una conducta dirigida voluntariamente a ejecutarlo” (dolo de primer grado); (2) “el hecho correspondiente es una consecuencia natural de la conducta voluntaria del autor” (dolo de segundo grado); o (3) “el sujeto ha querido su conducta a conciencia de que implicaba un riesgo considerable y no permitido de produ-cir el hecho delictivo realizado” (dolo eventual). 33 LPRA see. 4651.
De acuerdo con ello, y como hemos expresado anteriormente, uno de los fundamentos principales de hermenéutica legal es que siempre “debe describirse y hacerse cumplir la verdadera intención y deseo del poder legislativo”. Pueblo v. Zayas Rodríguez, 147 DPR 530, 549 (1999). Así las cosas, no podemos ahora, en el ejercicio de interpretar la ley, ignorar las intenciones que tuvo el legislador al realizar ese cambio transcendental en la redacción del Art. 106(b) en comparación con el Art. 83 del Código Penal del 1974 (33 LPRA sec. 4002 (ed. 2001)).
Lo expuesto deja meridianamente claro que no hay lugar para acusar en situaciones en las cuales ocurre una muerte casual, aunque sobrevenga mientras se comete o se intenta cometer uno de los delitos base. Ello, pues el legislador fue claro e intencionalmente plasmó en el Código Penal de 2004 la palabra “asesinato” en sustitución de “muerte”. Por lo tanto, el asesinato, al requerir intención, tiene que producirse ya sea como consecuencia natural de los actos del sujeto —no por el azar— o cuando su actuación contiene un riesgo conocido y aceptado por el sujeto que decide actuar, es decir, conoce la peligrosidad objetiva de su conducta.(20) Es por ello, que el legislador no realizó cambios al lenguaje utilizado en la parte final del Art. 106 del Código Penal de 2004, en la que hace referencia a “toda *800 otra muerte intencional” para definir el asesinato en segundo grado.
El cambio introducido en el Código Penal de 2004 causó que a tan solo meses de la aprobación del Código Penal de 2004, el 12 de mayo de 2005 la Asamblea Legislativa aten-diera el P. de la C. 1625.(21) Ese proyecto pretendía enmen-dar el inciso (b) del Art. 106 del Código Penal de 2004 para clarificar los elementos del delito de asesinato en primer grado y de la modalidad de asesinato estatutario. En su intento, buscaba introducir la frase “o incidental” y la frase “irrespectivo de la ausencia de premeditación, deliberación o intención de causarla o de que la persona muerta fuese coautora de los hechos” en el inciso (b) del mencionado ar-tículo para que leyera de la manera siguiente:
(b) Todo asesinato que se comete como consecuencia [natural] o incidentalmente en el transcurso de la consuma-ción o tentativa de algún delito de incendio agravado, agresión sexual, robo, escalamiento agravado, secuestro, secuestro de un menor, estrago, envenenamiento de aguas de uso público, agresión grave en su modalidad mutilante, fuga, maltrato in-tencional o abandono de un menor[.], irrespectivo de la ausencia de premeditación, deliberación o intención de causarla o de que la persona muerta fuese coautora de los hechos. (Enfasis en el original).(22)
No obstante, el cambio no fue aprobado por la mayoría. Sin duda alguna, la intención de la Asamblea Legislativa al no aprobar el texto propuesto fue que el delito de asesi-nato estatutario exigiera que la muerte fuera un asesinato como consecuencia natural y no un incidente casual en el transcurso de la consumación o tentativa del delito.
*801 De la misma forma, el P. de la C. 1625 de 12 de mayo de 2005 enfatizó que el Art. 106(b) no se refería a cualquier muerte, sino a un asesinato. Esto es, como hemos mencionado anteriormente, “dar muerte a un ser humano con intención de causársela”. De esta forma, es claro que el delito de asesinato estatutario exige una intención mínima de causar muerte a un ser humano.
Así las cosas, luego de 4 años y con una Asamblea Legislativa diferente, el 4 de febrero de 2009 la representante Jennifer González Colón propuso nuevamente modificar el Art. 106 mediante el P. de la C. 1036. Este proyecto pre-tendía enmendar el inciso (b) del Art. 106 del Código Penal de 2004, supra, para clarificar los elementos del delito de asesinato en primer grado y de la modalidad de asesinato estatutario. El proyecto, el cual copiaba la esencia del P. de la C. 1625 de 2005, recibió el voto mayoritario de la Cámara de Representantes; sin embargo, no recibió el aval de la Comisión de lo Jurídico Penal del Senado de Puerto Rico. El Senado denegó el P. de la C. 1036, porque al momento de su consideración ya se había aprobado el Código Penal de Puerto Rico de 2012, el cual en esencia acogía las enmiendas propuestas.(23)
Del análisis antes esbozado, se desprende que la intención de nuestra Asamblea Legislativa era, previo al Código *802 Penal de 2012, sustancialmente diferente a la interpreta-ción que le da el foro apelativo intermedio actualmente, ya que no tan solo cambió la redacción del estatuto, sino que el historial legislativo expresamente recalca que el asesi-nato estatutario queda reservado para aquellos “asesina-tos”, conforme a la definición de asesinato contenida en el Código Penal. Si bien en un principio se recomendó adop-tar en el Art. 106 del Código Penal de 2004, supra, el tér-mino “muerte” intencional, esa recomendación fue abando-nada oportunamente y sustituida por “asesinato”, con todo el rigor que esto implica.
B. Efecto del Art. 106(b) conforme fue finalmente apro-bado en el Código Penal de 2004
La peculiaridad del inciso (b) del Art. 106 estriba en que la conducta que típicamente sería catalogada como un asesinato en segundo grado o asesinato atenuado, por vía de este inciso (b), ha de considerarse como asesinato en primer grado con pena de 99 años de reclusión si se comete durante la consumación o tentativa de uno de los delito base. Por lo tanto, no tuvo otro efecto que convertir en asesinato en primer grado toda muerte intencional ocurrida “como consecuencia natural” de la comisión de uno de los delitos base incluidos en el propio inciso (b). Por su parte, en casos en los que el imputado sea un menor se exigirán los mismos elementos del delito, pero con las penas establecidas por la Ley Núm. 88 de 9 de julio de 1986, conocida como la Ley de Menores de Puerto Rico.(24)
Parecería que el propósito fundamental de la figura del asesinato estatutario, según redactado en el Código Penal de 2004, fue persuadir al criminal para que no asesine a sus víctimas mientras comete alguno de los delitos base. Esto, pues, castiga más severamente aquellos asesinatos cometidos mientras se comete o intenta cometer *803 ciertos delitos que son inherentemente peligrosos por la vulnerabilidad en la cual se encuentran sus víctimas, por lo que busca protegerlas. El legislador pretendió castigar de forma más severa al delincuente que mientras comete uno de estos delitos asesine a sus víctimas, en contraste con aquellos que únicamente cometen el delito.
Cabe señalar que la acción tomada por nuestra Asam-blea Legislativa en el Código Penal del 2004 en relación a esta figura ya había sido adoptada en varias jurisdicciones dentro y fuera de la nación americana. Por ejemplo, Inglaterra,(25) cuna de esta figura, derogó el asesinato estatuta-rio en 1957. Posteriormente estados de la nación americana como Hawaii(26) y Kentucky(27) han hecho lo mismo. Otros estados como Alaska(28) Vermont(29) Michigan(30) New Mexico(31) New Hampshire(32) y Arkansas(33) han adoptado una doctrina parecida a la de nuestro Código Penal de 2004, en las cuales requieren que la muerte se trate de un *804 verdadero asesinato, y más bien la doctrina es utilizada como un agravante del delito. Otras jurisdicciones han op-tado por atender el asunto de las muertes intencionales durante la consumación o tentativa de los delitos base como asesinatos estatutarios en primer grado y las que no se cometen con intención atenderlas como un asesinato es-tatutario de segundo grado. El propósito de los cambios en estas jurisdicciones ha sido atemperar el castigo con los actos intencionales del criminal y de esa manera evitar responsabilizar tan severamente a una persona por las muertes ocurridas durante el acto criminal que no surgen como consecuencia natural de sus actos.
hH 1 — 1 HH
Al revaluar los hechos de este caso, observamos que el señor Rodríguez Mojica, luego de encontrar al menor ESMR en los predios de su residencia mientras intentaba apropiarse ilegalmente de su propiedad, sorprendió al jo-ven con un golpe en la cabeza que dio inicio a un forcejeo entre ambos. Ese evento culminó cuando el menor ESMR logró huir por un pastizal aledaño al lugar. Acto seguido, el señor Rodríguez Mojica llamó a su sobrino, quien por órde-nes de su tío salió en busca de ESMR. Pasados aproxima-damente 25 minutos del incidente, cuando el señor Rodrí-guez Márquez regresó de buscar al menor por el pastizal fue que encontró a su tío tirado en el suelo con un golpe en la cabeza y morado. En conformidad con el derecho rese-ñado, los hechos ocurridos sugieren que el menor ESMR debe cumplir con la sentencia por la falta de escalamiento agravado, mas no por el asesinato estatutario.
Del análisis de los hechos resulta evidente que en el caso del peticionario no se cumple con el elemento de in-tención que requiere el Art. 106(b). La muerte del señor Rodríguez Mojica no fue un asesinato, por carecer de inten-ción de matar como exige la definición de asesinato en el *805 Código Penal. Por ello, descartamos responsabilizar crimi-nalmente al menor ESMR por la muerte del señor Rodrí-guez Mojica, mas no por el acto del escalamiento agravado, de lo cual sí es responsable criminalmente.
IV
Por todo lo anterior, se modifican las determinaciones de los foros “a quo”, a los efectos de revocar la convicción por el asesinato en primer grado y se devuelve el caso a la Sala de Menores del Tribunal de Primera Instancia para los proce-dimientos ulteriores.

Se dictará sentencia de conformidad.

La Jueza Asociada Señora Fiol Matta emitió un voto concurrente, al cual se unió el Juez Presidente Señor Her-nández Denton. La Jueza Asociada Señora Pabón Char-neco no intervino.

 33 LPRA sec. 4734.

 Alegato del peticionario, pág. 3.

 Transcripción de la prueba oral, pág. 7.

 íd., pág. 8.

 Alegato del peticionario, pág. 5.

 Art. 204 del Código Penal de Puerto Rico, 33 LPRA sec. 4832.

 Art. 106 del Código Penal de Puerto Rico, 33 LPRA sec. 4734.

 Apéndice de la Petición de certiorari, pág. 118.

 Véase M. Gómez Guerrero, El efecto del cambio en la redacción del asesinato estatutario, 47 Rev. Der Pur. 227, 230-231 (2008).

 Gómez Guerrero, supra.

 Véase Ponencia del Ledo. Luis Ernesto Chiesa Aponte sobre la P. del S. 2302, de 23 de mayo de 2003, pág. 19.

 Véanse: Pueblo v. Robles González, 132 DPR 554 (1993); Pueblo v. Rodríguez Rivera, 84 DPR 299 (1961).

 Pueblo v. Lucret Quiñones, 111 DPR 716 (1981).

 D. Nevares-Muñiz, Informe de Revisión del Código Penal de Puerto Rico, Vol. II, Capítulos I al X (1991), pág.3.

 Informes Parte Especial Vol. I y II de Estudios Comparados de Códigos Penales de la Comisión de lo Jurídico del Senado de Puerto Rico, http:// www.ramajudicial.pr/CodigoPenal/acrobat/08-Parte-D-Estudios-Comparados-de-Codigos-Penales-Parte% 20E.PDF (última visita, 6 de junio de 2013).

 Informe de la Comisión de lo Jurídico del Senado de 22 de junio de 2003, pág. 44, citando a su vez, con la corrección de los números de los artículos, Informes Parte Especial Vol. I y II de Estudios Comparados de Códigos Penales, supra, pág. 12.

 Ponencia del Ledo. Federico Rentas Rodríguez, director ejecutivo de la So-ciedad para Asistencia Legal sobre la R. del S. 203 de 22 de abril de 2002, págs. 11-13, http://www.ramajudicial.pr/CodigoPenal/acrobat/29-2003_0524- Sociedad-para-Asistencia-Legal.PDF. (última visita, 6 de jimio de 2013).

 D. Nevares-Muñiz, Código Penal de Puerto Rico: actualizado y comentado, 5ta ed. rev., San Juan, Instituto para el Desarrollo del Derecho, 2012, págs. 150-151.

 Ponencia del Ledo. Luis Ernesto Chiesa Aponte sobre la R. del S. 2302, de 23 de mayo de 2003, pág. 19. http://www.ramajudicial.pr/CodigoPenal/acrobat/28-2003_0523- Sr-Luis-Emesto-Chiesa-Aponte.PDF (última visita, 6 de junio de 2013).

 Véase D. Nevares-Muñiz, Nuevo Código Penal de Puerto Rico, Hato Rey, Instituto para el Desarrollo del Derecho, 2005, págs. 31-33.

 Cabe señalar que la composición de la Asamblea Legislativa que atendió el P. de la C. 1625 en el 2005 fue sustancialmente distinta a la que aprobó el Código Penal de 2004. Sin embargo, esa Asamblea Legislativa, como la anterior, permitió que el delito de asesinato estatutario se mantuviera como un asesinato consecuencia natural de los actos del sujeto.

 P. de la C. 1625 (2005), http://www.oslpr.org/files/docs/#FFEF4791-8D16-4D42-A28D-7B0050322540’.doc (última visita, 6 de junio de 2013).

 El Código Penal de 2012, Ley Núm. 146-2012, enmendó sustancialmente la figura del asesinato estatutario en su Art. 93 de la manera siguiente:
“Constituye asesinato en primer grado:
“(a) Toda muerte perpetrada por medio de veneno, acecho o tortura, o con premeditación.
“(b) Toda muerte que ocurra al perpetrarse o intentarse algún delito de incendio agravado, agresión sexual, robo, escalamiento agravado, secuestro, secuestro de un menor, estrago (modalidad intencional), envenenamiento de aguas de uso público (modalidad intencional), agresión grave, fuga, maltrato intencional, abandono de un menor; maltrato, maltrato agravado, maltrato mediante restricción de la libertad, o agresión sexual conyugal, según contemplados en la Ley Núm. 54 de 15 de agosto de 1989, según enmendada, conocida como la ‘Ley para la Protección e Intervención de la Violencia Doméstica’.
“Toda otra muerte intencional de un ser humano constituye asesinato en se-gundo grado”. (Énfasis suplido).

 34 LPRA sec. 2201.

 S. Prevezer, The English Homicide Act: A New Attempt to Revise the Law of Murder, 57 Colum. L. Rev. 624, 627 (1957).

 Hawaii, HI Rev Stat Sec. 707-701.

 Kentucky, KRS Sec. 507.020. “The KRS 507.020 does not preclude the type of conduct described above from constituting murder. It does, however, abandon the doctrine of felony murder as an independent basis for establishing an offense of homicide. [...] Thus, if a defendant intentionally commits an act of killing during a felony his guilt is to be determined under KRS 507.020(1)(a). [...] On the other hand, if the jury should determine that his participation constituted wantonness not manifesting extreme indifference to human life, he is guilty only of manslaughter in the second degree, KRS 507.040”. (Énfasis suplido). Kentucky Crime Commission/LRC commentary, KRS Sec. 507.020.

 Alaska, AS Sec. 11.41.100. “ ‘Felony murder’ ” is purposeful killing committed in perpetration of enumerated felonies in first-degree murder statute but, if such purposeful killing is not done in perpetration of one of the enumerated felonies, it may constitute second-degree murder or, if it is done in perpetration of felony but not with specific intent to kill, it may be manslaughter”. AS 11.15.010,11.15.030. Véase, además, Gray v. State, 463 P.2d. 897 (1970).

 Vermont, 13 V.S.A. Sec. 2301.

 Michigan, M.C.L.A. Sec. 750.316.

 New Mexico, N.M.S.A. 1978, Sec. 30-2-1. “[F]elony-murder statute serves to elevate second-degree murder to first degree when the murder occurs during the commission of a dangerous felony”. Campos v. Bravo, 141 N.M. 801, 161 P.3d 846 (2007), rehearing denied.

 New Hampshire, NH Rev Stat Sec. 630:1-a.

 Arkansas, A.C.A. Sec. 5-10-102.